United States Court of Appeals,

Fifth Circuit.

No. 92-7340.

VESTA INSURANCE COMPANY, Plaintiff-Appellant,

v.

AMOCO PRODUCTION COMPANY, Defendant-Appellee.

March 29, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before WIENER, BARKSDALE, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

In this Texas diversity case, the district court held, in its declaratory judgment from which Plaintiff-Appellant Vesta Insurance Company appeals, that (1) the subrogation clause in the Vesta policy of insurance does not apply to allocation of benefits between Defendant-Appellee Amoco Production Company and its insurers, and (2) Vesta owed Amoco attorneys' fees for its defense of a personal injury suit by Rudolfo Gonzales for the injuries he sustained in an accident at Amoco's facility. Disagreeing with the district court's interpretation of the contractual provisions as a matter of law, and with that court's application of Texas law to the admittedly intricate facts of this case, we reverse and render judgment in favor of Vesta.

I

FACTS AND PROCEEDINGS

Gonzales was seriously injured at Amoco's plant located near San Perlita, Texas, while in the employ of Cantu Lease, Inc. Gonzales sued Amoco and others in state district court, alleging that the negligence and gross negligence of all defendants was the producing cause of his injuries. Ultimately this negligence suit was settled by agreement among all of the parties, and a final judgment was entered providing for Gonzales to recover the sum of $6,215,000. At the time he was injured, Gonzales was performing various oil field services that Cantu had contracted to perform for Amoco under a "Well and Lease Service Master Contract" (the Master Contract). Pursuant to paragraph 10

of the Master Contract, Cantu as contractor agreed to:

> [D]efend, indemnify, and hold Amoco, its joint owner or owners, if any and their insurers, harmless from and against any and all losses, costs, expenses, and causes of action, including attorneys' fees and court costs, for injuries to and death of contractor's and its subcontractor's employees, arising out of, incident to or in connection with any and all operations under this contract, and whether or not such losses, costs, expenses, and causes of action are occasioned by or incident to or the result of the negligence of Amoco, its joint owner or owners, if any, and its agents, representatives, and employees.

Cantu maintained insurance coverage with Employer's of Texas Lloyds and Employer's National Insurance Company (collectively, Cantu's underwriters). This coverage included contractual liability protection for Cantu on its indemnity agreement with Amoco. The Cantu insurance policies listed various other oil and gas exploration and production companies as co-assureds, but Amoco was not included on that list.

Amoco maintained a Primary Integrated Risk Program of insurance with a group of underwriters headed by Vesta. Section IV of the program document covered Amoco for third party personal injury claims like the one suffered by Gonzales. Section IV specifies that:

> [Vesta's] limit of liability ... shall be only for the ultimate net loss in excess of the greater of:
>
> (A) the amount recoverable under Underlying Insurances,
>
> or
>
> (B) a self-insured retention of $5,000,000 ultimate net loss in respect of each occurrence ... (hereinafter called the "underlying limits")
>
> and then only up to the amount not exceeding $35,000,000 in respect of each occurrence subject to a limit of $35,000,000 in the aggregate for each annual period during the currency of this policy....

The Vesta policy further provides that:

> The term "ultimate net loss" shall mean the total sum which the assured [Amoco] or any company as his insurer becomes obligated to pay, by reason of personal injury ... claims, either through adjudication or compromise and shall also include ... expenses for doctors, lawyers, nurses, and investigators ... and for litigation, settlement, adjustment, and investigation of claims."

The policy also expressly addresses subrogation rights:

> Inasmuch as this Policy is "Excess Coverage", [sic] the Assured's right of recovery against any person or other entity cannot be exclusively subrogated to the Underwriters [Vesta]. It is, therefore, understood and agreed that in case of any payment hereunder, the Underwriters [Vesta] will act in concert with all other interests (including the Assured) concerned, in the exercise of such rights of recovery. The apportioning of any amounts which may be so

recovered shall follow the principle that any interests (including the Assured) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the Underwriters [Vesta] are then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly the interests (including the Assured) of whom this coverage is in excess are entitled to claim the residue if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the Assured) concerned, in the ratio of their respective recoveries as finally settled.

The settlement with Gonzales was entered into with the full knowledge and approval of Cantu and its underwriters and Amoco and all of its underwriters. Gonzales executed a settlement agreement releasing Amoco and all of its underwriters. In return, Amoco paid $2,715,000 to Gonzales, and Cantu's underwriters paid him $3,500,000—the limits of their policy coverage—totalling $6,215,000.

The plant where Gonzales was injured belonged to a joint venture in which Amoco held a 65.7% ownership interest. A dispute arose between Amoco and Vesta as to the amount, if any, that Vesta was obligated to reimburse Amoco for the sums it paid in the *Gonzales* settlement. Pursuant to a letter agreement, Vesta agreed to "loan/advance" to Amoco the sum of $798,255 (being 65.7% of the $1,215,000 difference between the total settlement and the $5,000,000 "underlying amount"); these parties agreeing to resolve their dispute through a declaratory judgment action which Vesta filed against Amoco in the federal district court at Galveston.

After the matter was presented on cross motions for summary judgment, the court held that Vesta was obligated to Amoco for the full amount of the $798,255 "loan/advance" under the terms of the policy. The court further held that Amoco was entitled to recover from Vesta the full amount of attorneys' fees incurred in defending the *Gonzales* suit, together with interest thereon. Vesta timely appealed.

## II

## ANALYSIS

This diversity case is governed by Texas substantive law.[1] The case was submitted to, and decided by, the district court on stipulated facts. Only questions of law were determined by that

---

[1]*Erie R.R. v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

court, consequently our review is de novo.[2]

A. *"Insurer" Status*

Under the terms of the contract between Vesta and Amoco, Vesta was only liable to Amoco for an "ultimate net loss" that exceeded $5,000,000. This contract defined "ultimate net loss" to include the total sum that Amoco or any company as its insurer became obligated to pay because of, inter alia, personal injury claims.

In the instant action, Amoco paid $2,715,000 directly to Gonzales, and Cantu, through its underwriters, paid Gonzales $3,500,000. If Cantu or its underwriters paid this money as Amoco's *insurers,* Amoco's "ultimate net loss" would clearly exceed $5,000,000 by $1,715,000 and Vesta would be liable to Amoco for 67.5% of that excess. Initially, therefore, we must determine whether Cantu and its underwriters paid Gonzales as Amoco's insurers.

Cantu contracted to operate and service wells and leases for Amoco. That contract obligated Cantu to "defend, indemnify, and hold ... harmless" Amoco and its insurers "from and against any and all losses, costs, expenses, and causes of action ... arising out of, incident to or in connection with any and all operations under this contract." Amoco proffered no other evidence that Cantu was its insurer.

Although an indemnity clause in a contract for services bears some relationship to insurance principles, the mere inclusion of such a clause is insufficient to render the indemnifying party an "insurer" of the other party. "For openers," *Black's Law Dictionary* provides some guidance in determining whether a contractual indemnitor is an insurer. "Indemnity" is defined to include a "contractual or equitable right under which the entire loss is shifted from a tortfeasor who is only technically or passively at fault to another who is primarily or actively responsible,"[3] and an "Indemnitor" is "the person who is bound by an indemnity contract to indemnify or protect the

---

[2]*Carpenters Amended and Restated Health Benefit Fund v. Holleman Construction Co.,* 751 F.2d 763, 766 (5th Cir.1985).

[3]*Black's Law Dictionary* 769 (6th ed. 1990).

other."[4]  Insurance is defined as a "contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils,"[5] and an "Insurer" is "the underwriter or insurance company with whom a contract of insurance is made."[6] These definitions suggest a substantive distinction between a party bound by a contractual indemnity clause and an insurer.

In defining the "business of insurance," the Supreme Court has stated, "The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk."[7] This definition also appears to be distinct from Cantu's status under the contract with Amoco.

Our analysis cannot stop at this point, however. Federal law expressly provides "that the business of insurance, and every person engaged therein shall be subject to the laws of the several states which relate to the regulation or taxation of such business."[8] Although the regulation of insurance is not exclusively delegated to the states, state law is a primary source of such regulation. "No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance...."[9] We must therefore examine the relevant Texas laws.

In Texas, as in most if not all states, insurance is a heavily regulated business.[10] Amoco presented no evidence that Cantu complied with the statutory requirements for qualification as an insurer. Further, the term "Insurance Business" is statutorily defined in article 1.14-1 of the Texas

---

[4]*Id.*

[5]*Id.* at 802.

[6]*Id.* at 808.

[7]*Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979).

[8]15 U.S.C. § 1012(a) (1992).

[9]15 U.S.C. § 1012(b) (1992).

[10]*See generally* Tex.Ins.Code Ann. (Vernon 1981).

Insurance Code,[11] and no conduct required of Cantu by the indemnity clause comes within the ambit of this definition.[12] We hold that one party to a contract for services is not an "insurer" of the other party to the contract solely because the first party indemnifies the second party pursuant to an indemnity clause in that contract.

B. *Application of Subrogation Clause*

Having determined that Cantu was not acting as Amoco's insurer when it paid Gonzales and therefore did not make that payment on behalf of Amoco, we must next determine how to apportion Cantu's payment between Amoco and Vesta. The subrogation clause in the contract between Amoco and Vesta establishes that any amounts recovered shall be apportioned among the parties as follows: 1) any party that has already paid more than its designated share shall first be reimbursed up to the excess amount paid;  2) Vesta is then to be reimbursed out of any balance then remaining up to the amount it paid;  and 3) lastly Amoco is entitled to claim any residue.

Under the terms of their contract, Vesta would be liable only after Amoco first satisfied a $5,000,000 self insurance retention. Amoco actually paid $2,715,000 to Gonzales—significantly less than the $5,000,000 self insurance retention. Consequently, if the subrogation clause applies to Cantu's payment, that payment must first be credited to any amount paid by Vesta before Amoco would be entitled to the residue.

Amoco argues that the subrogation clause should not be applied to the instant case because an insurer cannot exercise its right of subrogation against its own insured—it would defeat the purpose of insurance if an insurer co uld pay a loss then seek reimbursement from the insured. Although this may be a correct general statement of the law, it does not control the present situation. Vesta is not attempting to exercise subrogation rights against Amoco. Vesta's suit is based on a subrogation theory, but that subrogation theory runs against Cantu through Amoco, not against Amoco itself. Vesta is suing Amoco for *reimbursement* rather than for subrogation. This direct

---

[11]Tex.Ins.Code Ann. art. 1.14-1(2) (Vernon Supp.1992).

[12]*See Board of Ins. Comm'rs v. Kansas City Title Ins. Co.,* 217 S.W.2d 695 (Tex.Civ.App.—Austin 1949, writ ref'd n.r.e.) (holding that an agency contract was not reinsurance despite the fact that it required one party to indemnify the other party).

action for reimbursement is allowable because Cantu has already indemnified Amoco.[13]

Amoco also argues that Vesta's right to subrogation did not accrue until Vesta paid under the insurance policy. As Amoco had already been indemnified by Cantu, Amoco had no cause of action against Cantu by the time that Vesta made a payment under the insurance policy. And, as Amoco no longer had a cause of action against Cantu, there was no cause of action to which Vesta could be subrogated when it paid under the insurance policy. Therefore, Vesta's subrogation cause of action ceased to exist before it accrued. This argument does not advance Amoco's position.

Amoco cites an intermediate Texas appellate court opinion to support the proposition that "where an insured settles with or releases a wrongdoer from liability for a loss before payment of the loss has been made to the insurance company, the latter's right of subrogation is thereby destroyed."[14] Unfortunately for Amoco, such conduct also has the effect of forfeiting any claim the insured might have had under the insurance policy.[15] Additionally, although the insurance company would no longer have a cause of action against the tortfeasor, it would have one against the insured.[16]

Amoco's argument also ignores the express language of the indemnity clause between Cantu and Amoco in which Cantu agreed to indemnify not only Amoco, but also its insurers. It is arguable that Vesta could have proceeded directly against Cantu for indemnity without relying on the subrogation clause.

Finally, Amoco claims that subrogation is a purely equitable doctrine and cites the district court's statement that "it would be manifestly unfair to allow Vesta to avoid its contractual obligations

---

[13]*Peavey Co. v. M/V Anpa,* 971 F.2d 1168, 1176-78 (5th Cir.1992); *Gulf Ins. Co. v. Texas Casualty Ins. Co.,* 580 S.W.2d 645, 648 (Tex.Civ.App.—Fort Worth 1979, writ ref'd n.r.e.); *Gulf Ins. Co. v. White,* 242 S.W.2d 663, 666 (Tex.Civ.App.—Dallas 1953, no writ).

[14]*International Insurance Co. v. Medical Professional Bldg.,* 405 S.W.2d 867, 869 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n.r.e.).

[15]*Gulf Ins. Co. v. Texas Cas. Ins. Co.,* 580 S.W.2d 645, 648 (Tex.Civ.App.—Fort Worth 1979, writ ref'd n.r.e.); *Foundation Reserve Ins. Co. v. Cody,* 458 S.W.2d 214, 216 (Tex.Civ.App.—Dallas 1970, no writ); *State Farm Mutual Automobile Ins. Co. v. Elkins,* 451 S.W.2d 528, 531 (Tex.Civ.App.—Tyler 1970, no writ); *Gulf Ins. Co. v. White,* 242 S.W.2d 663, 666 (Tex.Civ.App.—Dallas 1953, no writ); *accord Millers Mutual Fire Ins. Co. v. Mitchell,* 392 S.W.2d 703, 706 (Tex.Civ.App.—Tyler 1965, no writ).

[16]*Gulf Ins. Co. v. White,* 242 S.W.2d at 666.

simply because Amoco had the good sense to protect itself from payments within its self insured retention."

Initially, we question the soundness of this statement by the district court. Vesta and Amoco both appear to be experienced business entities. The agreed statement of facts submitted to the district court recites: "The Vesta policy was drafted by each of the parties over a long period of time. Neither party is able to determine who drafted the actual clauses in issue [including the subrogation clause]." The language of the subrogation clause is not unusual or difficult to understand. Under the terms of the policy, Amoco could separately insure itself for any or all of its $5,000,000 self insurance retention. Amoco failed to take advantage of this opportunity, opting instead to include only an indemnity clause in the contract with Cantu—an indemnity clause which itself recognized the potential rights of Amoco's insurers in any indemnification.

The inclusion of the indemnity clause did eventuate to Amoco's benefit, albeit not to the extent desired by Amoco. The sums paid by Cantu had the effect of reducing by some $2,285,000 the amount that otherwise would have been paid by Amoco. If the settlement with Gonzales had not exceeded $5,000,000, the entire amount of the indemnification would have inured to Amoco's benefit; only if Gonzales's damages had exceeded $8,500,000 would the indemnity clause with Cantu have been of no benefit to Amoco. Even in this age of sizeable recoveries, an award of less than 8.5 million dollars is not so infrequent that Amoco could not have reasonably expected to benefit from the inclusion of the indemnity clause in its contract with Cantu. We are not at all convinced that there is any disparity in the equities here.

But even assuming that such a disparity existed, we would question the application of equitable principles to this subrogation claim. The instant case involves what Texas courts term "conventional subrogation," (subrogation that arises by contract) as distinguished from "legal subrogation" (subrogation that arises by operation of law).[17] Admittedly, legal subrogation is an

---

[17]*Lexington Ins. Co. v. Gray,* 775 S.W.2d 679, 683 (Tex.App.—Austin 1989, writ denied).

equitable concept and thus is governed by the principles of equity.[18]  But even though some jurisdictions treat the distinction between conventional and legal subrogation as merely procedural, Texas does not.[19]  Instead, Texas courts "generally allow a subrogee claiming against a third party under conventional subrogation to recover without regard to the relative equities of the parties."[20]

Texas law further recognizes that an underwriter is entitled to the benefits of subrogation as a matter of law (as distinguished from equity) even if its insured's right of recovery is contractual.[21] The San Antonio Court of Appeal interpreted a subrogation clause similar in wording to that in the Vesta policy to mandate that among excess carriers those contractually most remote from the primary coverage stand first in line when subrogation recoveries are distributed.  "Where the insurers' coverage is in the nature of layers, the excess carrier should recover under subrogation before primary insurers can be reimbursed.  One can look at subrogation recovery as reducing the net loss, in which case the excess carriers would not be obligated to pay the loss."[22]

Applying those same concepts to the instant case, in which the coverage provided by Vesta is excess to the self-insured underlying limits that Amoco was obligated to furnish, we conclude that the $3,500,000 payment contributed by Cantu's insurers towards the *Gonzales* settlement should be

---

[18]*Id., Galbraith-Foxworth, Lumber Co. v. Long,* 5 S.W.2d 162 (Tex.Civ.App.1928, writ ref'd); *see also United States Fidelity & Guaranty Co. v. First National Bank in Dallas, Tex.,* 172 F.2d 258 (5th Cir.1949).

[19]*Lexington Ins. Co. v. Gray,* 775 S.W.2d at 683.

[20]*Id.;  see also Girard Fire & Marine Ins. Co. v. Farmer,* 53 S.W.2d 1016 (Tex.Comm'n App.1932, judgm't adopted);  *Duval County Ranch Co. v. Alamo Lumber Co.,* 663 S.W.2d 627, 637 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.);  *Quincy Mutual Fire Ins. Co. v. Jones,* 486 S.W.2d 126 (Tex.Civ.App.—Dallas 1972, no writ);  *F.H. Vahlsing, Inc. v. Hartford Fire Ins. Co.,* 108 S.W.2d 947 (Tex.Civ.App.—San Antonio 1937, writ dism'd).

[21]*F.H. Vahlsing, Inc. v. Hartford Fire Insurance,* 108 S.W.2d 947 (Tex.Civ.App.—San Antonio 1937, writ dism'd);  *Rushing v. International Aviation Underwriters, Inc.,* 604 S.W.2d 239 (Tex.Civ.App.—Dallas, 1980, writ ref'd n.r.e.);  *Duval County Ranch Co. v. Alamo Lumber Co.,* 663 S.W.2d 627 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.);  *Highlands Insurance Co. v. New England Ins. Co.,* 811 S.W.2d 272 (Tex.App.—San Antonio 1991, no writ) (recognizing that subrogation was available even when the insured's right to recover rests on a Mary Carter settlement agreement).

[22]*Highland Ins. Co. v. New England Ins. Co.,* 811 S.W.2d 276, 278 (Tex.App.—San Antonio 1991, no writ) (quoting 16 *Couch on Insurance* § 61.48 at 133 (2d ed. 1983)).

deemed to come "off the top" of the ultimate net loss that Amoco sustained as a result of the *Gonzales* settlement. So doing leaves the balance of the funds, which were advanced by Amoco for the *Gonzales* settlement, as amounts which Amoco was obligated to pay under its self-insured underlying limit.

C. *Attorneys' Fees*

The district court also erred in awarding judgment in favor of Amoco against Vesta for the attorneys' fees incurred by Amoco in its defense of the *Gonzales* suit. The definition of the term "ultimate net loss" in the Vesta insurance policy expressly and unambiguously includes "expenses for doctors, lawyers, nurses, and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder." There is no separate covenant on the part of the Vesta underwriters to pay court costs and attorneys' fees or to provide a defense for Amoco. Rather, all litigation costs and expenses are simply built into the determination of its "ultimate net loss." Given our determination that its ultimate net loss, including attorneys' fees and costs has not exceeded $5,000,000, Amoco cannot recover from Vesta the attorneys' fees incurred in defending the *Gonzales* suit.

D. *Interest*

Vesta asserts that it is entitled to not only the reimbursement of the $798,255 loan/advance that it made to Amoco, but also to interest on that amount. We agree. Amoco's argument that interest cannot be awarded to Vesta because the loan/advance agreement did not expressly provide for the payment of interest is unpersuasive. The general rule is that "where the nature of the contract is such as to reasonably raise the inference that the loan was not a gratuity, one who lends money to or makes advances for the benefit of another is entitled to interest on the sum advanced, although nothing was said about interest at the time the transaction was made."[23] Texas statutory provisions also militate against Amoco's argument. Article 5069-1.03 of the Texas Revised Civil Statutes provides: "When no specified rate of interest is agreed upon by the parties, interest at the rate of six

---

[23]*Gray v. Laketon Wheat Growers, Inc.,* 240 S.W.2d 353, 356 (Tex.Civ.App.—Amarillo 1951, no writ).

percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable."[24]

The instant case parallels that of *Dolenz v. American General Fire & Casualty Co.*[25] In *Dolenz,* the insurer tendered a greater sum to the insured than the actual amount of damages as determined at trial. The Dallas Court of Appeals held that the insurer was entitled to prejudgment interest on the amount tendered that was in excess of the amount of the loss. The court awarded prejudgment interest at the rate of six percent per annum, calculated for a period beginning on the thirtieth day from the date of overpayment and ending on the date of judgment.[26] Likewise, we award prejudgment interest to Vesta on the full amount of its loan/advance to Amoco at the rate of six percent per annum, for the period beginning on the thirtieth day following the date of the loan/advance payment and ending the date of this judgment.

## III

## CONCLUSION

For the reasons set forth above, we reverse the judgment of the district court and render judgment in favor of Vesta and against Amoco for $798,255, being the amount paid by Vesta to Amoco pursuant to the "loan/advance agreement." We further award prejudgment interest on that amount at the rate of six percent per annum for the period beginning on the thirtieth day after the date of payment of the loan/advance and ending on the date of this judgment.

REVERSED and RENDERED.

---

[24]Tex.Rev.Civ.Stat. art. 5069-1.03 (Vernon 1987).

[25]798 S.W.2d 862 (Tex.App.—Dallas 1990, writ denied).

[26]*Id.* at 864-65 (applying Tex.Rev.Civ.Stat. art. 5069-1.03).